UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 AUG 13 PM 1: 55

CLERK

BY_____
DEPUTY CLERK

VICTOR G. HALL          )
                        )
        Petitioner,     )
                        )
    v.                  )        Case No. 5:14-cv-84
                        )
WILLIAM H. SORRELL,     )
Attorney General of Vermont, )
                        )
        Respondent.     )

**OPINION AND ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**
(Docs. 1, 8, 10 & 14)

This matter came before the court for a review of the Magistrate Judge's September 24, 2014 Report and Recommendation ("R & R"). (Doc. 14.) Pursuant to 28 U.S.C. § 2254, Petitioner Victor G. Hall filed a petition for a writ of habeas corpus against Respondent William H. Sorrell, Attorney General of Vermont. (Doc. 1.) In response to the petition, Respondent filed a motion to dismiss (Doc. 8), which Petitioner opposed in three filings. Petitioner also filed a motion to appoint counsel. (Docs. 9, 10, 12 & 13.)

The R & R recommends denying Petitioner's motion for a writ of habeas corpus because it is untimely and because Petitioner is unable to establish that he is entitled to equitable tolling. After the court granted Petitioner several extensions, on June 8, 2015, Petitioner filed his objection to the R & R. On June 15, 2015, he filed an addendum to his objection, stating, among other things, that the time granted was insufficient and that the actual innocence standard is unfair and insurmountable.[1] Respondent has not responded to Petitioner's objections and has not filed any of his own.

---

[1] *See* Doc. 23 at 1 ("I haven't had 7 years to prove my innocence – I've had 7 years of being ignored, or led on and given hope and THEN ignored, while courts and their officers insist that I'm a piece of garbage to be discarded and forgotten. Furthermore, how am I supposed to prove

## I.    Factual and Procedural Background.

Petitioner seeks a writ of habeas corpus, alleging that he was denied his right to a speedy trial, he received ineffective assistance of counsel, he entered into involuntary guilty pleas,[2] and that there is insufficient evidence to support his 2007 convictions for two counts of aggravated sexual assault on a child under ten years of age arising out of sexual conduct with his stepdaughter.  Petitioner requests the appointment of counsel to assist in preparing and arguing his petition.

Respondent seeks dismissal, arguing that this petition is barred by the applicable statute of limitations set forth in 28 U.S.C. § 2244(d).  Respondent further argues that Petitioner is not entitled to equitable tolling.

The procedural history of this case is recited at some length in the R & R and thus is merely summarized here.  On or about May 5, 2006, Petitioner was charged with two counts of aggravated sexual assault on a victim less than ten years old; one count of lewd and lascivious conduct with a child; and one count of obstructing justice.  His case was set for a jury draw on June 18, 2007, July 23, 2007, August 20, 2007, October 22, 2007, and November 26, 2007.  On November 26, 2007, Petitioner pleaded guilty to two counts of aggravated sexual assault and agreed to a sentencing range of 10 to 50 years on both counts to run concurrent.  As part of the plea agreement, the State agreed to dismiss the charges of lewd and lascivious conduct with a child and obstruction of justice at sentencing.  On January 22, 2008, the date scheduled for Petitioner's sentencing, Petitioner sought to withdraw his guilty pleas which request was denied.  The case proceeded to sentencing and Petitioner was sentenced to serve 10 years to 50 years on

---

my innocence in the first place?  Against charges like mine?").

[2] Parts of the record submitted by Respondent indicate that the undersigned presided over Petitioner's change of plea.  Respondent submitted an exhibit that states: "The cover page and page 3 of the transcript indicate that the presiding judge was the Hon. Christina Reiss.  However, the presiding judge was, in fact, the Hon. Linda Levitt." (Doc. 7-3 at 28, n.1.)  Petitioner does not dispute this representation.  The undersigned confirms she did not preside over Petitioner's change of plea, sentencing, or post-conviction relief.

each count of conviction, to run concurrent, and with credit for time served. The remaining charges were dismissed.

On February 21, 2008, Petitioner filed a notice of appeal. On February 26, 2008, Petitioner filed a motion to reconsider his sentence which was denied as the case was on appeal. On November 5, 2008, the Vermont Supreme Court found "no basis to disturb the judgment[,]" and did not permit Petitioner to withdraw his guilty pleas because of his "multiple prior admissions of guilt and the substantial delay in coming forward with the evidence in question[.]" *State v. Hall*, 2008 WL 4906948, at *2 (Vt. Nov. 1, 2008) (unpublished mem.). In reaching this conclusion, the Vermont Supreme Court noted the following:

> In May 2006, defendant was charged with two counts of aggravated sexual assault against his stepdaughter, who was under the age of ten at the time, and one count of lewd and lascivious conduct with the same victim. The affidavit of probable cause in support of the charges recounted that defendant had revealed the offenses to his wife several years after their occurrence; that defendant and his wife subsequently disclosed the incidents to the Department for Children and Families, which contacted the police; and that defendant thereafter acknowledged having sexual contact with his stepdaughter during an interview with the Chittenden Unit for Special Investigations investigating officer. Defendant was later charged with several additional counts of possession of child pornography and one count of obstructing justice based upon a threatening letter to his wife.

*Id.* at *1.

Petitioner sought reargument before the Vermont Supreme Court which rejected the request as untimely. Petitioner then requested reconsideration of the denial which was also denied based upon a conclusion that Petitioner had failed to establish a compelling reason to overturn or disturb the Vermont Supreme Court's decision. Petitioner again sought reconsideration. On November 5, 2009, the Vermont Supreme Court denied this request and advised that it would not consider any further motions from Petitioner seeking reconsideration or reargument of the matter.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), there is a one year statute of limitations to file "an application for a writ of habeas corpus

by a person in custody[.]" 28 U.S.C. § 2244(d)(1). The limitations period runs from the latest of: the date the judgment became final; the date an impediment to filing was removed; the date the constitutional right was recognized; or the date that the new evidence could have been discovered. *See id.* §§ 2244(d)(1)(A)-(D).

On December 18, 2009, Petitioner filed a petition for post-conviction relief in the Vermont Supreme Court. Five days later, on December 23, 2009, he filed an application for a writ of habeas corpus in this court which contained claims for which Petitioner had exhausted his state court remedies and others for which he had not. Petitioner expressed a desire to withdraw his habeas petition so that he could exhaust his claims in Vermont's state court and, on that basis, the petition was dismissed without prejudice. In doing so, the Magistrate Judge provided guidance to Petitioner regarding how the limitations period would be calculated. *See Hall v. Sorrell*, 2010 WL 1740816, at *2 (D. Vt. Apr. 7, 2010), *report and recommendation adopted*, 2010 WL 1740819 (D. Vt. Apr. 28, 2010).

The Vermont trial court subsequently denied Petitioner's claim for post-conviction relief on the basis of ineffective assistance counsel and denied Petitioner's motion to reconsider. On December 18, 2013, the Vermont Supreme Court affirmed the denial of Petitioner's request for post-conviction relief. *See In re Hall*, 2013 WL 9055937, at *3 (Vt. Dec. 18, 2013). On January 13, 2014, the denial became final when the Vermont Supreme Court denied Petitioner's motion for reargument because he "fail[ed] to identify points of law or fact overlooked or misapprehended by this Court." (Doc. 7-13 at 1.)

Petitioner filed his request for a writ of habeas corpus on April 28, 2014, over a month past the applicable limitations period. Petitioner appears to concede that his filing was untimely and he does not the challenge the Magistrate Judge's calculation of the applicable deadline as set forth in the R & R. He nonetheless asks the court to excuse his late filing on the basis of equitable tolling.

## II.     Conclusions of Law and Analysis.

### A.     Standard of Review.

A district judge must make a *de novo* determination of those portions of a magistrate judge's report and recommendation to which an objection is made. *See* 28

U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Cullen v. United States*, 194 F.3d 401, 405 (2d Cir. 1999). The district judge may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge]." 28 U.S.C. § 636(b)(1); *accord Cullen*, 194 F.3d at 405. In his objections to the R & R, Petitioner asserts that the Magistrate Judge erred in finding equitable tolling did not apply and in finding Petitioner's evidence of actual innocence insufficient.

### B. Whether Petitioner is Entitled to Equitable Tolling Based on his Lack of Knowledge of the Deadlines and the Alleged Refusal to Provide Advice or the Provision of Incorrect Advice.

The Magistrate Judge recommended rejecting Petitioner's claims that he failed to file a timely habeas petition because he was uncertain of the applicable deadlines and because the Vermont Defender General and Prisoners' Rights Office refused to give him advice. The court agrees that, without more, this will not excuse an untimely petition. *See Cordle v. Guarino*, 428 F.3d 46, 49 (1st Cir. 2005) ("While [the petitioner] argues that she lacked knowledge of the law and the filing deadline, it is well settled in this circuit that [i]gnorance of the law alone, even for incarcerated *pro se* prisoners, does not excuse an untimely [habeas] petition.") (internal quotation marks omitted).

In his objection to the R & R and his addendum to that objection, Petitioner reiterates the arguments he raised before the Magistrate Judge and more fully explains the reasons for his noncompliance with the AEDPA's limitations period. He asserts that he is not an attorney, should not be held to procedural deadlines, and that it is unreasonable and unjust to expect him to understand and adhere to the complexities of the AEDPA. Courts have generally rejected such claims as a basis for equitable tolling. *See, e.g., Doe v. Menefee*, 391 F.3d 147, 175 (2d Cir. 2004) (observing that "pro se status does not itself constitute an extraordinary circumstance meriting tolling"); *Royal v. Lee*, 2012 WL 7009773, at *5 (S.D.N.Y. Dec. 13, 2012), *report and recommendation adopted*, 2013 WL 465331 (S.D.N.Y. Feb. 6, 2013) ("[Petitioner's] argument that he is not an attorney and should not be penalized for his ignorance of the law also does not justify equitable tolling.").

5

Petitioner further asserts that he received "bad legal advice" from the Vermont Department of Corrections ("VTDOC") which apparently arises out of his use of "a number of computers containing searchable legal resources, provided by VTDOC for inmates' research and reference." (Doc. 23 at 2.) He contends that VTDOC's instructions (which he does not provide) led him to miscalculate the deadline for his habeas petition and that he "didn't seek corroboration from other sources." *Id.* He does not explain the manner in which VTDOC's instructions misled him and he does not assert that he had no means of obtaining correct information from other available computerized resources. He also does not allege that he was unaware of the AEDPA's existence, its limitations period, or the consequences of non-compliance with its deadlines. *Cf. Killimayer v. Rock*, 2013 WL 5586651, at *10 (S.D.N.Y. Oct. 9, 2013) ("Petitioner's allegation that a prison law clerk's failure to advise him of AEDPA's existence does not, without more, constitute a violation of the state's obligations, because he has failed to show that this omission prevented him from filing a federal habeas petition.").

In his addendum, Petitioner asserts that the Supreme Court's ruling in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), applies and excuses his untimely filing. In *Martinez*, the State of Arizona required the petitioner to raise an ineffective assistance of counsel claim as a collateral attack to his conviction. The petitioner failed to raise this claim in a timely manner because his appeals counsel did not inform him that he had to file a petition for post-conviction relief within forty-five days. The trial court then dismissed the petitioner's motion for post-conviction relief, which the appeals court affirmed. In rejecting the petitioner's habeas petition, the District of Arizona ruled "that Arizona's preclusion rule was an adequate and independent state-law ground to bar federal review[,]" which the Ninth Circuit affirmed. *Id.* at 1315. The Supreme Court reversed, concluding:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral

proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.* at 1320.

This case is distinguishable from *Martinez* because Petitioner was able to present his petition for post-conviction relief to the Vermont courts, including his claim of ineffective assistance of counsel. The Vermont Supreme Court affirmed the denial of post-conviction relief, not because Petitioner missed a deadline, but because he could not present a legal expert to support his ineffective assistance of counsel claim. *See In re Hall*, 2013 WL 9055937, at *3 ("We concur with the superior court's conclusion that this is not one of those rare cases in which petitioner could prove ineffective assistance of counsel without the benefit of expert testimony."). Accordingly, unlike in *Martinez*, Petitioner suffered no procedural default in the state courts due to ineffective assistance of counsel.

After carefully reviewing Petitioner's arguments and submissions, the Magistrate Judge concluded that Petitioner is not entitled to equitable tolling because he has not shown that he diligently pursued his rights or that an extraordinary circumstance prevented his timely filing. *See Rivas v. Fischer*, 687 F.3d 514, 538 (2d Cir. 2012) ("[T]he limitations period in § 2241(d) is subject to equitable tolling in appropriate cases—specifically, where the petitioner shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.") (internal quotation marks omitted). For purposes of equitable tolling, "[t]he term 'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period." *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011). The focus is thus not on "how unusual the circumstance alleged to warrant tolling is among the universe of prisoners," but rather on the magnitude of the obstacle that prevented compliance with the AEDPA's limitations period. *Diaz v. Kelly*, 515 F.3d 149, 154 (2d Cir. 2008).

"As a general matter, [the Second Circuit] set[s] a high bar to deem circumstances sufficiently 'extraordinary' to warrant equitable tolling." *Dillon v. Conway*, 642 F.3d

358, 363 (2d Cir. 2011). "The burden of demonstrating the appropriateness of equitable tolling" lies with Petitioner. *Bolarinwa v. Williams*, 593 F.3d 226, 232 (2d Cir. 2010).

Here, Petitioner identifies the same obstacles that any unrepresented individual would face in filing a habeas petition. He identifies nothing "extraordinary" that prohibited him from overcoming these obstacles or which rendered the time allotted to do so insufficient. He acknowledges that he had access to computerized legal resources, that he was aware of the AEDPA's existence, and that he knew that there was a filing deadline that he was expected to meet. Although Petitioner alleges that the Magistrate Judge adopted a "bullying approach[,]" (Doc. 23 at 2), by concluding that ignorance of the law is no excuse, the Magistrate Judge in fact provided assistance to Petitioner beyond what was required. Even assuming Petitioner acted diligently, he has failed to sustain his burden to demonstrate that an "extraordinary circumstance stood in his way and prevented timely filing." *Rivas*, 687 F.3d at 538. The court thus agrees with the R & R that equitable tolling is not available on this basis.

### C.    Whether Petitioner is Entitled to Equitable Tolling on the Basis of Actual Innocence.

As an alternative ground, Petitioner asserts that he is entitled to equitable tolling on the basis of actual innocence. "[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims (here, ineffective assistance of counsel) on the merits notwithstanding the existence of a procedural bar to relief." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013).

> [T]o demonstrate actual innocence in a so-called collateral proceeding, a petitioner must present new reliable evidence that was not presented at trial and show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt. Where the defendant pleaded guilty (as in the instant case), and therefore did not have the evidence in his case evaluated by a jury, the standard nevertheless remains the same—*i.e.*, the petitioner still must show that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him.

*Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 114 (2d Cir. 2000) (citation and internal quotation marks omitted). Petitioner's burden is thus "extraordinarily high" and

must consist of a "truly persuasive demonstration[ ] of 'actual innocence[.]'" *Herrera v. Collins*, 506 U.S. 390, 426 (1993).

As the R &R observed, "[f]or the claim to be credible, it must be supported by new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." (Doc. 14 at 13-14) (quoting *Rivas*, 687 F.3d at 541) (internal citation and quotation marks omitted). In the proceeding before the Magistrate Judge, Petitioner relied on proffers of evidence including his own statements that he falsely admitted to committing the crime because he was threatened by his wife, the results from a polygraph examination, and statements that he contends the minor victim told police officers that exonerate him from the crime. The Magistrate Judge concluded that this evidence would be insufficient to show "that more likely than not any reasonable juror would have reasonable doubt." *Id.* (internal quotation marks omitted).

In his objection to the R & R, Petitioner concedes: "There is no new evidence that I'm innocent." (Doc. 23 at 9.) He questions why new evidence should be required and why "old" evidence of his alleged innocence should not suffice. In terms of "old" evidence, Petitioner submits a number of exhibits which he argues demonstrate his innocence. Specifically, Petitioner asks the court to examine the docket sheet from his criminal case; the affidavit of probable cause in support of the charges which led to his convictions; two notes from a defense investigator stating that there was evidence that the victim recanted; a statement from a witness indicating that the victim had stated she did not remember the crimes; excerpts from the victim's deposition testimony; his own handwritten note asserting his innocence on the date of his change of plea; excerpts from his change of plea and sentencing hearings; and the results of two polygraph examinations. It is not clear whether these submissions were all presented to the Magistrate Judge. In order to foreclose further argument on this point and to ensure full consideration of the merits of Petitioner's arguments, the court will consider these

submissions as part of Petitioner's objection to the R & R, regardless of whether they were presented to the Magistrate Judge.[3]

In support of his claim of actual innocence, Petitioner submits the May 3, 2006 affidavit of probable cause which recites that when Petitioner and his wife approached a DCF representative with a report of sexual abuse, Petitioner:

> "went into a lengthy discussion regarding how the family has 'healed' themselves on their own and assured them that nothing else has happened within the last five years. Hall revealed to DCF that 4-5 years ago, he showered with his five (5) year old daughter and that during the shower his daughter [name and date of birth deleted] touched his penis. He allowed this contact to occur and it progressed to [the daughter] touching his penis with her mouth. Victor advised that he reciprocated this action and touched [the daughter's] genitals with his mouth.

(Doc. 23-3 at 2, ¶ 1.)  DCF reported the sexual abuse to the police which interviewed Petitioner, his wife, and the victim.  The affidavit of probable cause indicates that Petitioner called law enforcement and agreed to a second interview which was surreptitiously recorded.  According to the affidavit of probable cause, in this second interview, Petitioner provided the following information:

> 12.  Hall explained that 4-5 years ago he had "**inappropriate contact**" with his daughter.  He told us this information came out in July of 2002 when [the victim] shared this information with his wife and her mother Melissa. He advised they came up with a safety plan for him and [the victim] and that there was no neglect when dealing with the "**issue**." Hall stated that he has worked hard to "**recover**" from what happened.  Hall explained that due to Melissa wanting to disclose this information to a therapist, he decided to volunteer to report this to DCF.

> 13.  Hall explained they were an "**open**" family and would sleep in the nude and be nude around the house.  Hall told us that he would allow [the victim] to sit on his lap while they were both nude, but that his penis never

---

[3] "[A] district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance." *Taylor v. Astrue*, 32 F. Supp. 3d 253, 260 (N.D.N.Y. 2012).  However, if the interests of justice so require, a district court retains the authority to exercise its discretion and consider the new evidence in a *de novo* review of an R & R.  *See Hynes v. Squillace*, 143 F.3d 653, 656 (2d Cir. 1998) ("[T]he district court [has] discretion to consider evidence that had not been submitted to the Magistrate Judge.").

went into her vagina.  He advised there may have been incidental contact, but nothing sexual in nature.

14.  Hall advised that when they lived in Burlington with his wife's family the first sexual contact occurred with [the victim].  He recalled that [the victim] would lift the waistband to her underwear and "**direct**" his hand to her vaginal area.  He would scratch her back and rub her stomach.  Hall explained that he "**consented**" to this touching.  This contact continued to their Colchester residence, but progressed when they showered together.  Hall explained "**oral contact was allowed.**"  He told us that his daughter [the victim], who was approximately 5-6 at the time, asked for him to "**reciprocate**" the oral sex onto her.  Hall assured us there was never any "**grooming or coercion.**"

15.  Hall admitted, "**I was the one letting this happen.**"  He explained there were less then twelve separate incidents that occurred within a one year time frame.  He told us that there were times that he would rub the outside of [the victim's] vaginal area with the tips of his fingers while both he and his wife were in the same bed with [the victim].  [His wife] Melissa was not aware of this and [the victim] was awake during the rubbing.  He told us there was no digital penetration, but the contact was skin on skin.  Hall explained touching [the victim] was not for the purpose of "**stimulation.**"

16.  While in the Colchester residence, a game was played in the shower when [the victim] would catch water dripping off parts of Hall's body to include his "**elbows and penis**" with her mouth.  He explained this is when the "**tip**" of his penis penetrated [the victim's] mouth and that this occurred 3-6 separate times.  He admitted that he had a "**partial erection**", and that he never "**climaxed.**"  Hall described this sexual action as a "**novelty and a curiosity.**"  He told us that he never thought of [the victim] as a "**sex aid.**"

17.  Hall explained that he had "**poor judgment**" and that he has a "**[debt] to pay**" to [the victim] and Melissa, but nobody else.  Hall expressed that he was "**embarrassed and ashamed**" for what he did but that it was "**probably**" nice to have the attention from [the victim].

18.  Hall further told us of times when he would put [the victim] to bed and she would ask, "**Will you lick me?**"  Hall recalled there were times that he would not and then there were other times when he would.  He told us that he did not recall [the victim] having a sexual reaction when he performed oral sex on her.  Hall admitted "**There was a sexual component**", "**There was physical enjoyment**", and stated, "**I did not think of her as a sex object.**"  Hall told us that he never masturbated after having sexual contact with his daughter.

11

19.  Hall agreed the fact that [the victim] came forward to her mother is what stopped the continued sexual abuse and that if [the victim] had not disclosed that it is possible the abuse would have continued.

*Id.* at 4-5, ¶¶ 12-19.

Petitioner does not deny making these recorded statements and concedes that he in fact admitted to more sexual contact than the victim actually reported.  He asks the court to compare his version of the sexual contact with the victim's version of events and find the alleged lack of consistency evidence of his innocence.  He argues that if a jury heard from his stepdaughter's eleven year old friends that she disavowed her accusations against him, and if he and the victim both "admitted that [their statements] were untrue and coerced[,]" (Doc. 23 at 9), he would have been acquitted at trial.  Not only does this amount to pure speculation, it discounts the impact of Petitioner's confessions at trial.[4]  The Supreme Court has recognized that:

> A confession is like no other evidence.  Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . .  [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct.  Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so."

*Arizona v. Fulminante*, 499 U.S. 279, 296 (1991).

Contrary to Petitioner's contentions, there is no requirement under Vermont law that his confessions dovetail precisely with the victim's accusations in order for a jury to find him guilty beyond a reasonable doubt.  *See State v. FitzGerald*, 683 A.2d 10, 16 (Vt. 1996) ("The purpose of the corpus delicti rule is to foreclose the possibility of a conviction based on false confession where, in fact, no crime has been committed.  The rule mandates that where the State's case is based on a confession, the corpus delicti must

---

[4] Petitioner does not argue that his confessions were the product of police coercion and thus his claims that his wife forced him to falsely confess would not preclude the admission of his confessions at trial.  *See Yarborough v. Alvarado*, 541 U.S. 652, 667-68 (2004) (holding that "the voluntariness of a statement" depends on whether "the defendant's will was overborne" by police coercion) (quoting *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)).

be corroborated by independent evidence.  The corroborating evidence need not independently prove the commission of the crime beyond a reasonable doubt, however; even slight corroboration may be sufficient.") (internal citations omitted); *State v. Stocker*, 2002 WL 34423560, at *2 (Vt. May Term 2002) (unpublished entry order) (applying corpus delicti rule to confession to sexual assault on a minor and finding that "at least slight corroborative evidence" is necessary "but that slight corroboration need not independently establish the defendant's guilt beyond a reasonable doubt, or even by a preponderance of evidence").

In Petitioner's case, the victim's accusations provided sufficient corroboration to satisfy the corpus delicti doctrine.  When interviewed by the police in 2006, after confirming that she knew the difference between the truth and a lie, the victim told the police that "[i]t happened" when she was "[t]aking showers with" Petitioner.  (Doc. 23-3 at 3, ¶ 5.)  The affidavit recites that the victim had a difficult time explaining what "it" was because her voice would become soft and her eyes would become watery.  The victim told the police that the sexual contact occurred in her bed and in the shower.  She stated that Petitioner touched her in her vaginal area with his penis, that she felt his penis "go in," and that she put her mouth on his penis.  At the time, the victim denied that Petitioner performed oral sex on her.  She described the appearance of Petitioner's penis, instances in which he touched her vaginal area, and instances in which she and Petitioner would have their pants off and their shirts on.  She appeared to take responsibility for some of the conduct by repeatedly telling the police that it occurred because she was "curious."  The victim indicated that Petitioner touched her because her parents were having marriage problems and Petitioner "was in a 'sad mood.'"  *Id.* at 3, ¶ 7.  She further explained that she slept in the same bed as Petitioner but only engaged in "'good cuddling'" not "'bad cuddling.'"  *Id.* at 3, ¶ 9.  The victim reported that Petitioner had admitted to her that the abuse occurred and promised it would never happen again after a "family talk" about the abuse.

Petitioner submits an excerpt from the victim's September 19, 2007 deposition testimony in which the victim testified that she recalled two episodes of sexual conduct

13

with Petitioner: one time was "in the shower . . . he abused me there. And one time in the bed." (Doc. 23-7 at 4:9-4:10.) She testified that Petitioner was nude around her "a lot" when she was being abused but not after the abuse ceased. *Id.* at 12:19-12:23. She also recalled an instance in which she was with Petitioner and they had their pants off and their shirts on.

The victim further testified that she understood that she had actually been sexually abused six times, but that she did not remember the other events because "it was so long ago[.]" *Id.* at 4:14. She heard from her therapist that it was six times, and noted that she was "5 or 6" at the time. *Id.* at 4:19. She testified that she was sure that it happened because she heard that it happened from a lot of people that she trusted, "[e]specially from Victor. He says it happened." *Id.* at 5:21. Petitioner has not provided the pages of the deposition transcript wherein the victim repeats Petitioner's "exact words[.]" *Id.* at 5:23. The victim further testified that Petitioner told her "[h]e was sorry for what he did. And I know that won't cut it." *Id.* at 6:6. She noted that she reported to the police that she had sexual intercourse with Petitioner twice but that she did not recall those events. She recalled telling the police that she was "curious" and discussing "good cuddling and bad cuddling." *Id.* at 8:5-8:7; 8:19-22.

Both the victim and Petitioner's accounts of the sexual abuse focus on events that occurred in the shower and in the victim's bed when she was approximately five or six years old. Each account indicates that Petitioner engaged in oral sex with the victim; that Petitioner's penis and hands touched the victim's genital area; that the victim allegedly contributed to the abuse by being "curious;" that Petitioner was nude in the household and the family slept in the same bed at times; that there was a "family talk" about the abuse during which Petitioner apologized; and that the abuse ceased thereafter. The victim thus corroborated key components of Petitioner's confessions. Any discrepancy between the victim's accounts and Petitioner's more detailed confessions is easily explained by the marked differences in their ages and the passage of time. Moreover, any discrepancies merely serve to underscore that Petitioner was only charged, pled guilty to, and convicted of crimes to which he admitted. *See* Doc. 23 at 8 ("I was charged for only

14

what elements were in my version of the story; my daughter's story had different elements. That means that she didn't accuse me of everything that I claimed responsibility for."). A comparison of Petitioner's confessions and the victim's accusations thus does not contribute materially to a claim of actual innocence. Petitioner's other submissions do not alter that conclusion.

Exhibit C, dated March 29, 2007, is a report from E. Guy Paradee, a defense investigator, documenting an interview with approximately eleven year old Teremy Lee Garens and her parents who reported that they were "completely satisfied" that Petitioner had not molested their daughter, who expressed criticism of Petitioner's wife, and who noted that they would be willing to testify on Petitioner's behalf at trial. The report recites that the victim told Teremy Garens that Petitioner did not sexually assault her and that the victim stated that her mother had told her to "say bad things about" Petitioner. (Doc. 23-4 at 3.) In her deposition testimony, the victim admits that Teremy Garens is her best friend, but denies telling her that she lied about the sexual abuse and denies telling her that her mother asked her to lie about it.

Exhibit D, dated September 10, 2007, is an email from Mr. Paradee stating that the victim told the McSweeneys that she was forced to lie about the sexual assaults. When the victim was asked in deposition if she knows the McSweeney's daughter, the victim testified she "think[s] so." (Doc. 23-7 at 6.)

The statements in question are not under oath and the credibility and reliability of the declarants is unknown. It is clear from the statements that the parents of the children in question are supporters of Petitioner and are critical of his wife. Each statement contains multiple levels of hearsay. Petitioner does not contend these statements would be admissible at trial.

Although Petitioner is correct that evidence indicating that the eleven year old victim claimed to have lied about the abuse when talking to her friends would tend to undercut her credibility, the courts have noted that recantations of sexual abuse are common and must be viewed in the context of the abusive relationship. *See, e.g.*, *State v. Duffy*, 605 A.2d 533, 535 (Vt. 1992) ("The admissibility of trustworthy early

15

communications is particularly crucial because of 'the high probability of a child victim recanting a statement about being abused sexually.'"). Moreover, most courts, including the Vermont courts, permit expert testimony to explain why a victim may recant. *See State v. Lumumba*, 2014 VT 85, ¶¶ 4-9 (ruling it was not reversible error to allow expert testimony to explain the behavior of the victim which may include "a delay in reporting, recantation, or a continued relationship with an abuser."); *State v. Weeks*, 628 A.2d 1262, 1268 (Vt. 1993) ("The expert, as the State's last witness, testified that delayed reporting of sexual abuse and recantation are not unusual phenomena.").[5]

Exhibit G is a handwritten note by Petitioner, dated November 26, 2007, in which he states that he intends to plead guilty despite his innocence. Petitioner alleges that he gave this note to his defense investigator before pleading guilty but he does not claim that he gave it to his attorney, the prosecutor, or the judge or asked that the defense investigator do so on his behalf. Petitioner does not contend this note would be admissible at trial.

Exhibit H contains excerpts from the change of plea hearing on November 26, 2007. In the hearing, the State stated that Petitioner performed oral sex on the victim and the victim performed oral sex on Petitioner. Petitioner did not contest the facts at the time, he did not claim he had been manipulated by his wife into a false confession, and he did not make any claim that his guilty pleas were involuntary. To the contrary, he made

---

[5]     A common defense strategy in child sexual abuse cases is to undermine the child's credibility by pointing out that the child delayed reporting, gave inconsistent versions of the abuse over time, or recanted. Of course, this is entirely legitimate impeachment. When the defense adopts this strategy, however, it is fair for the prosecution to rehabilitate the child's credibility with expert testimony. An expert may testify that it is not uncommon for sexually abused children to delay reporting, be inconsistent, or recant. . . . Frequently when children finally disclose, they give slightly different versions of the abuse to different interviewers. Finally, although there is debate about how many sexually abused children recant, it is undisputed that some children recant and some recant their recantation.

John E.B. Myers, *Expert Testimony in Child Sexual Abuse Litigation: Consensus and Confusion*, 14 U.C. Davis J. Juv. L. & Pol'y 1, 44-46 (2010) (footnotes omitted).

an affirmative representation that he wanted to take responsibility for his crimes. *See* Doc. 7-10 at 7 ("I want to take responsibility for what happens, the other is not wanting to put my stepdaughter through continued stress in the legal process, Your Honor.").

Exhibit I contains excerpts from the January 22, 2008 hearing on Petitioner's motion to withdraw his guilty pleas and his sentencing. At that proceeding, the following colloquy occurred:

> **The Court:** Doesn't it seem to you like an about-face when you said to me you wanted to accept responsibility and not put your child through the stress of a trial?
>
> **Mr. Hall:** Exactly. I want to accept responsibility for what happened. These things did not happen. I'm not trying to manipulate [t]he Court, Your Honor.
>
> **The Court:** Then why did you tell me that it did happen?
>
> **Mr. Hall:** I agreed to what the State had said during the, the change of plea hearing. I agreed to her reading the charges before [t]he Court, that's the charges that were pending, I did not feel that I was actually admitting to having done those things. This has been one long prolonged episode of mitigating damages, of damage control, by trying to preserve my liberties[.]

(Doc. 23-10 at 4:7-4:25.)

Exhibit E, dated January 9, 2008, is a signed letter by Cristalee McSweeney that describes statements the victim allegedly made to Ms. McSweeney's daughter that "she was being forced by her mother to take a side and that her mother was pushing her into believing a story that she did not remember." (Doc. 23-6 at 3.) Ms. McSweeney's daughter also asked her if the victim "could live with [them] because [her mother] was forcing her into telling lies about" Petitioner. *Id.* The letter is supportive of Petitioner and critical of his wife. It purports to have been written after Petitioner's guilty pleas, but before the hearing on his motion to withdraw those pleas. Petitioner presented the letter to the court in support of his motion to withdraw and thus it was in the record before the

state courts.  In rejecting the McSweeney letter as fabricated,[6] Judge Levitt cited the following admissions by Petitioner:

> You admitted you abused your child to your ex-wife, you admitted you abused your child to the DCF worker, you admitted that you abused your child to the police officer, and you admitted you abused your child to me in court during the change of plea, and to claim that all you were admitting was that [was what] the charges were, as the State's attorney said, is putting form over substance.  You admitted the facts of the case as explained by the State's attorney, and when I asked you if there is anything that needed correcting or changing, you said, "No."

(Doc. 23-10 at 10:2-10:14.)  Petitioner does not contend that Judge Levitt inaccurately described his admissions, nor does he contend that the McSweeney letter would be admissible at trial.

As part of this same exhibit, Petitioner submits the partial testimony of a witness at his sentencing hearing who describes what the victim told her about Petitioner's sexual abuse.  Petitioner identifies the witness as the victim's pediatrician.  It is not clear how this testimony would exonerate Petitioner as it indicates that the victim described sexual intercourse and oral sex with Petitioner.  The witness further testified that the victim described the sexual abuse perpetrated by Petitioner in at least one interview outside her mother's presence.  It appears that Petitioner seeks to use this testimony as further evidence of inconsistencies between his confessions and the victim's accusations.

Exhibit J contains the results of two polygraph examinations conducted on December 20, 2012 (approximately five years after Petitioner pled guilty and approximately ten years after the crimes).  The examinations reveal that Petitioner denied that he "ever allow[ed] [the victim] to perform oral sex on" him, that he "perform[ed] oral sex on her[,]" and that he "commit[ed] any kind of sex act with her[.]"  (Doc. 23-11 at 2.)  The examiner found Petitioner showed no signs of deception while making these statements.  The same examiner also found no deception when Petitioner denied that he took "that photo of [the victim's] butt for pornographic purposes[.]"  *Id.* at 3.  It appears

---

[6] Petitioner does not include the full transcript of the sentencing hearing, but Judge Levitt found "this piece of paper, letter to be fabricated and in further manipulation of the system, which you have been attempting to do throughout."  (Doc. 23-10 at 10:15-10:18.)

that the polygraph results were available for Petitioner's post-conviction relief proceedings and were thus considered by the state courts. Although Petitioner appears to acknowledge that the results would not be admissible at trial, *see United States v. Kwong*, 69 F.3d 663, 668 (2d Cir. 1995), he erroneously contends that they are reliable evidence of actual innocence. *See Olivares v. Ercole*, 975 F. Supp. 2d 345, 353 (S.D.N.Y. 2013) ("[A] polygraph test is not reliable evidence of actual innocence.").

In his June 15, 2015 addendum, Petitioner attaches a notarized letter from Nadine Holbrook-Andersen as his "new" evidence of his actual innocence. Ms. Holbrook-Andersen reported that she spoke with the victim, who is now twenty years old, on May 15-16, 2015. She reported that the victim maintained her accusations of sexual abuse. In response, Ms. Holbrook-Andersen told the victim that she may have been closer to the truth when she said she did not remember the events, which caused the victim to cry.

Exhibit A is a docket sheet from Petitioner's criminal case in the Vermont District Court which he offers to show that he did not cause the delays that contributed to Judge Levitt's denial of his motion to withdraw his guilty pleas. The docket sheet reveals a series of continuances at least some of which are attributable to Petitioner and some of which arise from his requests to represent himself which were then followed by his requests that counsel be appointed for him. Petitioner's change of plea, which was originally scheduled for June 9, 2006, took place on November 26, 2007. It took place only after a jury draw was scheduled on five occasions. Against this backdrop, Petitioner's claims that he "never got the chance to put [his] case PROPERLY before a jury," (Doc. 23 at 9), that he "repeatedly insisted on taking [his] case to trial," (Doc. 23-2 at 1), and that he was "denied a trial" (Doc. 23-10 at 1) are without support in the record. Judge Levitt's observation that the "record is filled with [Petitioner's] requests for continuance after continuance after continuance in front of Judge Kupersmith, who had this case on for jury trial three, four times" (Doc. 23-10 at 3:17-3:21), was thus not unfounded. Moreover, it is clear that Judge Levitt did not deny Petitioner's motion to withdraw his guilty pleas on this basis alone, but relied upon Petitioner's multiple admissions of his guilt.

19

Individually and collectively, Petitioner's submissions do not satisfy the exacting standard of actual innocence because they do not render it more "likely than not that no reasonable juror would have convicted him." *See Lucidore*, 209 F.3d at 114. His repeated confessions of his guilt to the victim, his wife, DCF, and the police would be "probably the most probative and damaging evidence that can be admitted against him" as they "come from the actor himself." *Fulminante*, 499 U.S. at 296. The victim, despite her youth and obvious reluctance, corroborated key elements of those confessions and the victim, now an adult, has apparently confirmed her allegations that the sexual abuse occurred. Petitioner had numerous opportunities to present his case to a jury and ample time in which to build a defense. The evidence that he points to which he claims establishes his innocence is either inadmissible or would depend on the testimony of two eleven year olds who have no personal knowledge of the events. *See Rivas*, 687 F.3d at 541 (explaining that "[f]or the claim to be credible, it must be supported by new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence") (internal citation and quotation marks omitted). A rational jury could hear their testimony and still find Petitioner guilty beyond a reasonable doubt—especially if the State presented an expert witness to testify that recantations by victims of sexual abuse are common when the abuser is a close family member. Petitioner's new and old evidence of actual innocence therefore falls far short of establishing his actual innocence. The Magistrate Judge thus properly rejected equitable tolling on this basis.

### D.      Whether Petitioner is Entitled to Appointment of Counsel.

Petitioner requests the appointment of counsel to assist him in his habeas petition. He points out that he does not have legal training and requires counsel to adequately argue his position. He has, however, demonstrated an ability to cite to the record and to the caselaw in support of his arguments. *See Evans v. Tilton*, 2008 WL 506196, at *1 (S.D. Cal. Feb. 22, 2008) (noting that a petitioner's ability to discuss relevant facts and cite cases diminished his argument that he is unable to understand the law). Moreover, appointed counsel cannot change the facts and circumstances which render equitable

tolling unwarranted.[7]  In such circumstances, appointment of counsel is properly denied. *See Clark v. Kuhlman*, 2009 WL 87507, at *4 (E.D.N.Y. Jan. 12, 2009).

## CONCLUSION

In his R & R, the Magistrate Judge carefully reviewed the record and properly determined that Petitioner is not entitled to relief from judgment under 28 U.S.C. § 2254. The court finds the Magistrate Judge's recommendation well-reasoned and adopts it in full.

For the foregoing reasons, the court hereby ADOPTS the Magistrate Judge's R & R, as supplemented herein, as the court's Order and Opinion (Doc. 14), GRANTS Respondent's Motion to Dismiss (Doc. 8), DISMISSES Petitioner's Petition (Doc. 1), and DENIES Petitioner's Motion to Appoint Counsel (Doc. 10).
SO ORDERED.

Dated at Burlington, in the District of Vermont, this _13th_ day of August, 2015.

Christina Reiss, Chief Judge
United States District Court

---

[7] For example, Petitioner cites no grounds on which his confessions could have been suppressed. Accordingly, appointed counsel could not alter the likelihood that a jury would hear that Petitioner confessed to the crimes on multiple occasions to multiple individuals.